UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
MARKUS KING-KNIGHT,                                    Case No. 23 CV 4648
                Plaintiff,                       (PKC) (RWL)

      -against-

                                  **AMENDED COMPLAINT**

THE CITY OF NEW YORK, DETECTIVE STEPHEN
GEARY [TAX REG. #894008], DETECTIVE MIGUEL
BENCOSME [TAX REG. #897018], DIANA HO, DR.
EUGENE Y. LIEN, DR. CRAIG O'CONNOR, ADA
DEBRA A. GUARNIERI, ADA RACHEL S. SINGER,
and JOHN DOE AND JANE DOE #1-10 (the names
John and Jane Doe being fictitious, as the true names are
presently unknown),
                Defendants.
-----------------------------------------------------------------------X

Plaintiff, MARKUS KING-KNIGHT, by his attorney, The Law Offices of UGO UZOH,

P.C., complaining of the defendants herein, The City of New York, Detective Stephen

Geary [Tax Reg. #894008], Detective Miguel Bencosme [Tax Reg. #897018], Diana Ho,

Dr. Edward Y. Lien, Dr. Craig O'Connor, ADA Debra A. Guarnieri, ADA Rachel S.

Singer, and John Doe and Jane Doe #1-10 (collectively, "defendants"), respectfully

alleges as follows:

<u>NATURE OF THE ACTION</u>

1.        This is an action at law to redress the deprivation of rights secured to the
plaintiff under color of statute, ordinance, regulation, custom, and/or to
redress the deprivation of rights, privileges, and immunities secured to the
plaintiff by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the
Constitution of the United States, and by Title 42 U.S.C. §§ 1983 and 1988,
and arising under the law and statutes of the City and State of New York.

2.        Plaintiff spent approximately thirteen years wrongfully incarcerated based on
fabrications and other wrongful conduct of the individual defendants
including, but not limited to, the use of
unconstitutional suggestive identification procedures and violation of their

obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose that there had been a change in protocols between the time they issued their report as to the initial examination of DNA evidence and the comparison of the plaintiff's DNA profile making it impossible to report any possible inclusion or statistic had they used the protocols in place at the time.

## JURISDICTION

3.      The jurisdiction of this Court is invoked pursuant to 42 U.S.C. §§ 1983 and 1988, 28 U.S.C. §§ 1331, 1343 and 1367, and under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

4.      As the deprivation of rights complained of herein occurred within the Southern District of New York, venue is proper in this district pursuant to 28 U.S.C. § 1391 (b) and (c).

## COMPLIANCE WITH N.Y. GEN. MUN. LAW REQUIREMENTS

5.      Plaintiff timely made and served a notice of claim upon the defendants in compliance with N.Y. Gen. Mun. Law § 50-e.

6.      At least thirty days have elapsed since the service of aforesaid notice of claim and adjustment or payment thereof has been neglected or refused.

7.      This action is commenced within one year and ninety days after the happening of the event(s) upon which the claim(s) is based.

## THE PARTIES

8.      Plaintiff is and was at all times material herein a resident of the City and State of New York.

9.      Defendant City of New York ("City") is a municipal corporation duly organized and existing under the laws of the State of New York.

10.     The City of New York Police Department ("NYPD"), New York City Office of Chief Medical Examiner ("OCME"), and Bronx County District Attorney's Office ("BCDA") are agencies of defendant City, and all named individual defendants were at all times relevant to this complaint employees and agents of defendant City.

11.     Defendant Detective Stephen Geary [Tax Reg. #894008] was at all times material herein a detective employed by the NYPD. He is named here in his official and individual capacities.

12.     Defendant Detective Miguel Bencosme [Tax Reg. #897018] was at all times material herein a detective employed by the NYPD. He is named here in his official and individual capacities.

13.     Defendant Diana Ho was at all times material herein a Criminalist employed by the OCME. She is named here in her official and individual capacities.

14.     Defendant Dr. Eugene Y. Lien was at all times material herein an Assistant Director and Nuclear DNA Technical Leader employed by the OCME. He is named here in his official and individual capacities.

15.     Defendant Dr. Craig O'Connor was at all times material herein a Criminalist/Assistant Technical Leader, Nuclear DNA Operations, employed by the OCME. He is named here in his official and individual capacities.

16.     Defendant ADA Debra A. Guarnieri was at all times material herein an Assistant District Attorney employed by the BCDA. She is named here in her official and individual capacities.

17.     Defendant ADA Rachel S. Singer was at all times material herein an Assistant District Attorney employed by the BCDA. She is named here in her official and individual capacities.

18.     Defendants John Doe and Jane Doe #1-10 ("John Doe and Jane Doe") were at all times material herein individuals and/or officers employed by NYPD, OCME, and/or BCDA. They are named here in their official and individual capacities.

19.     Defendants Geary, Bencosme, and John Doe and Jane are collectively referred to herein as "NYPD defendants".

20.     Defendants Ho, Lien, O'Connor, and John Doe and Jane are collectively referred to herein as "OCME defendants".

21.     Defendants Guarnieri, Singer, and John Doe and Jane are collectively referred to herein as "BCDA defendants".

22.     NYPD defendants, OCME defendants, and BCDA defendants are collectively referred to herein as "individual defendants".

23.     At all times material to this Complaint, the individual defendants acted toward plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York.

FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

Ms. Deborah Warner-Blessingame's August 29, 2008 house party

24.     On August 29, 2008, Deborah Warner-Blessingame ("Ms. Blessingame") hosted a party for her son ("party"), Darnell Pabon, for being discharged from parole supervision.

25.     The party, which started on the aforesaid date at approximately 9:00 p.m., was held at Ms. Blessingame's home located at 1895 Harrison Avenue, Bronx, New York ("house").

26.     The house consists of several rooms including four or five bedrooms and a living room.

27.     Upon information and belief, the party was held in the living room.

28.     Ms. Blessingame and her family invited several people to the party including some of their friends and neighbors from their old neighborhood, Boston Road and East 168th Street, which is also located in Bronx, New York ("old neighborhood").

29.     A lot of people attended the party including some people from the old neighborhood.

30.     Among those who attended the party from the old neighborhood were Ms. Nikita Williams and her friend, Ms. Colleen Shepherd.

31.     A young man from the old neighborhood known to Ms. Blessingame and her family by his nickname "Rizzo" was also at the party.

32.     Rizzo came to the party with up to eleven men.

33.     Another young man from the old neighborhood known to Ms. Blessingame and her family by his nickname "Ski" also came to the party with another group of men.

34.     Most of the people at the party were in their late teens and early twenties, and were friends with Ms. Blessingame's sons, Darnell and Jaquan, except for the men who came with Rizzo and Ski.

35.     Ms. Blessingame and her family weren't familiar with the men who came with Rizzo and Ski and were concerned about them due to their actions and attitude.

36.     Rizzo, who wore a red Do Rag to the party, is believed to be a member of the Blood street gang.

37.     The men that Rizzo brought with him seem to belong to the same Blood street gang.

38.     The party eventually shut down on August 30, 2008, at approximately 5:00 a.m.


Plaintiff does not reside within the old neighborhood

39.     At all times material herein, plaintiff did not live in nor reside within the old neighborhood and is not acquainted with individuals from that neighborhood.

40.     On April 1, 2005, plaintiff's late mom, Wendy King, rented and/or moved into 1137 Forest Avenue, Apt. #1, Bronx, New York ("apartment"), located approximately two or three blocks away from the old neighborhood but plaintiff did not live or reside in the apartment.

41.     Prior to his arrest on April 30, 2009, plaintiff did not know Mses. Williams, Shepherd, and Blessingame, and did not know any of the individuals who attended the party.

42.     Plaintiff did not attend the party and has never been to the house.

The August 30, 2008, shooting incident at the house

43.     On August 30, 2008, at approximately 5:00 a.m., the party eventually shut down.

44.     Most of the partygoers had already left prior to the shutdown.

45.     After the party was shut down, the remaining partygoers started exiting the house.

46.     Mses. Williams and Shepherd were among the last partygoers to exit the house after the part was shut down.

47.     There was a heavy downpour during the party, and it was still raining at the time when the partygoers started making their exit.

48.     Some of the partygoers stood on the stoop located in front of the entrance door to the house to call for and/or wait for cabs.

49.     Some partygoers stood at the bottom of the staircase leading to the entrance door of the house from the street while some partygoers stood on the sidewalk located in front of the staircase.

50.     After exiting the house, Mses. Williams and Shepherd stood on the stoop right by the entrance door to the house with some of the partygoers to call for and wait for their cab.

51.     Ms. Shepherd stood closer to the entrance door to the house and was a few feet away from the door.

52.     Ms. Williams stood right in front of Ms. Shepherd and was closer to the staircase.

53.     After calling for a cab, Ms. Williams got into a verbal altercation with a group of men who came from the party over the cab.

54.     Within a few minutes after the altercation, someone from the group of men fired what appeared to be four gunshots from either the bottom of the staircase or from the sidewalk towards the stoop area where Mses. Williams and Shepherd were located.

55.     Upon hearing the gunshots, Mses. Williams and Shepherd attempted to run back to the house.

56.     Ms. Shepherd appeared to be struck by one bullet on her back.

57.     Ms. Shepherd fell near the entrance door to the house and called out to Ms. Williams.

58.     Ms. Williams stopped running and helped Ms. Shepherd get up.

59.     Mses. Williams and Shepherd attempted to open the entrance door to the house but realized that it had been locked.

60.     Mses. Williams and Shepherd started banging on the door screaming that Ms. Shepherd had been shot.

61.     Mess. Williams and Shepherd pleaded with Ms. Blessingame and her family to open the door and let them in.

62.     Eventually, Ms. Blessingame and her family opened the entrance door and Mses. Williams and Shepherd went back into the house.

63.     Immediately upon entering back into the house on August 30, 2008, at approximately 5:16 a.m., Ms. Williams used her cell phone to call 911.

64.     Ms. Williams informed the 911 operator that Ms. Shepherd was shot by an unknown black male wearing hair braids.


NYPD officers and EMS personnel responded to the shooting incident

65.     On August 30, 2008, at approximately 5:20 a.m., several NYPD officers and Emergency Medical Services (EMS) personnel arrived at or close to the house in response to the shooting incident.

66.     NYPD Police Officers Rosandre Burgher [Tax Reg. #941470] and Victor M. Cedeno [Tax Reg. #941522] assigned to NYPD-46th Precinct ("precinct") were among the first officers to arrive at the scene.

67.     Upon observing the EMS vehicle, Mses. Williams and Shepherd left the house and walked down the stairs to meet with NYPD officers and EMS personnel.

68.     Ms. Shepherd informed EMS personnel and Police Officers Burgher and Cedeno that she was arguing with a group of guys who she did not recognize over a cab ride and one of the guys shot her in the back and disappeared.

69.     Ms. Shepherd described the guy that shot her as a black male wearing a red shirt and blue pants with short hair braids.

70.     Ms. Shepherd was subsequently transported to St. Barnabas Hospital by EMS personnel escorted by Police Officers Burgher and Cedeno.

NYPD officers conducted an investigation into the shooting incident

71.     NYPD Detective Joseph B. Richman assigned to the precinct subsequently recovered a fireman and a black Nextel cell phone nearby at 1820 Harrison Avenue, Bronx, New York.

72.     Richman later turned over the fireman and cell phone to Geary at the precinct.

73.     NYPD Detective Kurt S. Wiebke [Tax Reg. #941522] assigned to NYPD-Evidence Collection Team subsequently conferred with Geary concerning the firearm and the cell phone.

74.     Geary turned over the firearm to Wiebke who vouchered it.

75.     Geary confirmed receipt of the cell phone but indicated that he was holding on to it for further investigations.

76.     Geary did not turn over the cell phone to Wiebke and did not voucher it.

77.     On August 30, 2008, at approximately 6:25 a.m., NYPD Detective Michael Cullen [Tax Reg. #915534] assigned to NYPD-Detective Borough Bronx County interviewed Ms. Williams at the hospital.

78.     Ms. Williams indicated during the interview that she had a verbal altercation with a guy over a cab and the guy lost control and started shooting, and that Ms. Shepherd ended up with a gun shot in her back.

79.     Ms. Williams described the shooter as a short black male in his early twenties with a stocky build wearing hair braids.

80.     Ms. Williams stated that the shooter had a *black handgun and was at the party, but she did not know him.*

81.     Based upon her medical chart, Ms. Shepherd arrived at the hospital with EMS personnel on August 30, 2008, at approximately 5:35 a.m., was

promptly triaged as trauma code, and was accompanied by EMS personnel *only* and brought directly to the hospital's trauma bay where she was started with IVF NS bolus and had X-rays of her chest and ribs taken.

82. Ms. Shepherd remained admitted in the trauma bay unit until approximately 6:30 a.m. when she was transferred to the emergency department unit's ED1 bed 2.

83. Ms. Shepherd did not receive any visitors including, but not limited to, friends and family members while she was admitted into the hospital's trauma bay unit.

84. At all times material herein, the hospital did not allow visitors including, but not limited to, friends and family members access to its trauma bay unit.

85. As a matter of fact, only doctors and medical personnel are allowed entry into the hospital's trauma bay unit.

86. As a result, Cullen did not have access to Ms. Shepherd and was unable to interview her while he was at the hospital.

87. It was not until approximately 8:25 a.m., after Ms. Shepherd had been moved out of the hospital's trauma bay unit, that friends and family members were allowed to visit her with Officer Burgher on guard at her bedside.

88. Upon information and belief, Geary subsequently interviewed Ms. Williams at the precinct on August 30, 2008, at approximately 9:00 a.m., concerning the shooting incident.

89. During the interview, Ms. Williams gave a similar statement as her earlier statements to the 911 operator and Cullen except that she now claimed that she believed that the shooter was a member of the Blood street gang, described him as a short 5'6" or 5'7" male black, and claimed that the shooter stated that "he just got out of jail and he didn't get any p***y yet".

Geary lied about receiving an anonymous tip

90.     According to Geary, he canvassed the area around the house on August 30, 2008, at approximately 12:30 p.m., for cameras and witnesses but he did not observe any cameras nor locate any witnesses.

91.     After stating that he did not locate any witnesses, Geary claimed that he was approached by an unknown black female while he was still in the area but that the female did not identify herself.

92.     Geary claimed that the unknown black female, upon approaching him, stated that she *heard* that the shooter was a male black named Marcus and that his last name *may* be King.

93.     According to Geary, he subsequently obtained photos from the photo manager on the same day -- August 30, 2008, at approximately 4:00 p.m. -- of male blacks named Marcus including a photo of the plaintiff.

94.     Geary obtained a mugshot photo of the plaintiff from a *sealed* arrest which occurred on January 13, 2008 -- approximately seven months prior to the shooting incident.

95.     Geary did not preserve any of the photos of the other male blacks named Marcus which he allegedly obtained from the photo manager.

96.     Geary emphasized that that the plaintiff resided within the confines of NYPD-42nd Precinct.

97.     Although plaintiff on a few occasions gave or listed the apartment -- which is located within the confines of NYPD-42nd Precinct -- as his address, plaintiff did not live or reside in the apartment and did not live or reside within the confines of NYPD-42nd Precinct at any time.

98.     The unknown black female was manufactured and/or created by Geary and did not exist at any time.

99.     Geary and the NYPD defendants simply identified the plaintiff as a suspect and immediately began to frame him as the shooter.

100.    Except for contacting the NYPD-Bronx Gang Division on August 30, 2008, at approximately 1:00 p.m., to inquire about Rizzo and learning that his real

name is Frank Blair, Geary and the NYPD defendants did not follow up or investigate any of the individuals who were at the party including, but not limited to, Rizzo and Ski.

NYPD defendants began a campaign to frame the plaintiff as the shooter

101.    Aside from records indicating that Geary prepared DD-5 Follow-Up Nos. 20 and 21 on September 5, 2008, purportedly documenting his aforesaid/alleged August 30, 2008 canvass of the area around the house and the photos of male blacks named Marcus, which he allegedly obtained from the photo manager, Geary officially did absolutely nothing concerning the shooting incident for at least ten days after allegedly obtaining the aforesaid sealed photo of the plaintiff.

102.    During that period, however, Geary, Bencosme, and the NYPD defendants were busy spreading word in and around the old neighborhood that they had identified the plaintiff as the sole suspect and/or perpetrator of the shooting.

103.    Geary, Bencosme, and the NYPD defendants then began spoon-feeding witnesses false information during pre-interviews for repetition in official statements and began to coerce witnesses to falsely implicate the plaintiff.

104.    Geary, Bencosme, and the NYPD defendants did not document their above-described unlawful conduct including the campaign to frame the plaintiff.

105.    Geary, Bencosme, and the NYPD defendants also falsified some of the witnesses' statements.

106.    On September 9, 2008, approximately ten days after the NYPD defendants were informed by eyewitnesses that they were not familiar with the shooter and did not know his identity and long after the NYPD defendants had started pressuring witnesses (including, but not limited to, Mses. Williams and Shepherd) to implicate the plaintiff, Geary and Bencosme arranged to meet with Ms. Williams.

107.    Upon information and belief, Geary and Bencosme informed Ms. Williams prior to the meeting that they had a photo of the shooter named Marcus and

that they were bringing the photo of the shooter so she could look at it and place her initials on the paper.

108.    As with their campaign to frame the plaintiff, and their effort to spoon-feed and coerce witnesses to falsely implicate the plaintiff, Geary and Bencosme did not document their conversations with Ms. Williams leading up to their meeting.

109.    Geary and Bencosme also did not document their conversations with Ms. Shepherd except for Geary's February 14, 2009 telephone call to Ms. Shepherd.

110.    According to Geary, he contacted Ms. Shepherd on said date, at approximately 2:00 p.m., and the "complainant states she does not have any additional information on the perp."

111.    On September 9, 2008, at approximately 7:00 p.m., Geary and Bencosme drove to the old neighborhood and met with Ms. Williams at or close to the corner of Boston Road and East 168th Street, Bronx, New York.

112.    During this meeting, Geary gave Ms. Williams the sealed January 13, 2008 mugshot and asked her to place her initials on the paper.

113.    At the time when Geary gave Ms. Williams the sealed January 13, 2008 mugshot and asked her to place her initials, Ms. Williams was seated in the back seat of the police car with Bencosme seated in the front passenger seat and Geary, the driver, seated in the driver's seat.

114.    Geary and Bencosme did not bother to redact plaintiff's arrest information and/or personal details prior to handing over the mugshot to Ms. Williams.

115.    This was intentional.

116.    Geary and Bencosme were simply carrying out their pattern and practice of spoon-feeding and coercing witnesses to falsely implicate the plaintiff.

117.    At no time did Geary and Bencosme conduct any lawful identification proceedings in the underlying criminal matter.

118.    Rather, Geary documented in his DD-5 Follow-Up No. 22, documenting their September 9, 2008 meeting with Ms. Williams, that after he gave Ms. Williams the sealed January 13, 2008 mugshot, Ms. Williams "identified the

photo of Marcus King" and informed them that she "was told that the perp's name is Marcus" and that she "has known of him and seen him in the neighborhood for years."

119.    Following the meeting, Geary issued an investigation card (ICARD) for the plaintiff's arrest.

120.    Geary, Bencosme, and the NYPD defendants began a campaign of harassment and intimidation against the plaintiff and his family.

121.    Upon information and belief, NYPD defendants immediately began to conduct surveillance of the apartment.

122.    In addition to the aforesaid surveillance, the NYPD defendants harassed, bullied, and intimidated plaintiff's family members by, among other things, repeatedly banging on their windows and entrance door and maintaining a heavy police presence in and around the apartment.

123.    On April 30, 2009, at approximately 11:00 p.m., plaintiff was arrested by NYPD defendants and charged with numerous crimes including, but not limited to, attempted murder.

124.    At all times material herein, the NYPD defendants did not conduct any proper identification procedures and, therefore, the plaintiff was never identified by any victim or witness as the shooter or perpetrator of the August 30, 2008 shooting at any time prior to his arrest.

Pre-trial proceedings

125.    Plaintiff was subsequently arraigned in the Bronx Criminal Court on the false charges levied against him.

126.    Bail was set in the amount of $500,000 to secure the plaintiff's release.

127.    Because plaintiff could not make bail, plaintiff was remanded and was transported to Rikers Island where he was incarcerated for several years awaiting trial.

128.    On or about May 15, 2009, the grand jury relying on NYPD defendants falsified records and coerced witness statements including the testimony of

Mses. Williams and Shepherd -- who had become well rehearsed liars and who were promoted by NYPD defendants -- returned a true bill of indictment charging plaintiff with N.Y. PL 110/125.25(1) 'Attempted Murder in the second degree', N.Y. PL 120.10(1) 'Assault in the first degree', N.Y. PL 120.05(1) 'Assault in the second degree', N.Y. PL 120.05(2) 'Assault in the second degree', N.Y. PL 120.00(1) 'Assault in the third degree', N.Y. PL 265.03(1)(b) 'Criminal possession of a weapon in the second degree', N.Y. PL 265.03(3) 'Criminal possession of a weapon in the second degree', and N.Y. PL 265.01(1) 'Criminal possession of a weapon in the fourth degree'.

129.    At a Rodriguez hearing held on April 27, 2011, Geary, who had consistently lied to the prosecutors that he conducted a proper single photo identification procedure with Ms. Williams on September 9, 2009, lied that prior to their September 9, 2009 meeting, Ms. Williams gave him a description of the plaintiff, told him that she had known the plaintiff from the neighborhood for a few years, told him that her baby's father, Jarmaine, had a cousin named LaTonia who dated the plaintiff and that she and Jarmaine would often play video games with LaTonia and the plaintiff at Jermaine's grandmother's home several times every week for several years.

130.    On April 28, 2011, when Ms. Williams testified at the Rodriguez hearing, she testified that she merely saw the plaintiff once for a brief moment at Jermaine's grandmother's house and that she did not tell Geary that she knew the plaintiff nor did she inform Geary that the plaintiff was the shooter until after Geary showed her the plaintiff's mugshot.

131.    Ultimately, the criminal court determined that Geary's single photo identification was totally improper and unconstitutionally suggestive but that it would be up to the jury to determine the credibility of any in court identification.

The first trial proceedings

132.    Plaintiff's first trial commenced with jury selection in or about May 2011, in the Supreme Court, Bronx County.

133.    Assistant District Attorney Guarnieri was the assigned prosecutor with ADA Singer assigned as the assistant prosecutor.

134.    After a presentation of evidence that lasted several weeks (including the summations and jury charge), the jury deliberated for several days.

135.    The jury sent the trial judge multiple notes indicating that it was deadlocked 11 to 1.

136.    Ultimately, the jury voted to acquit the plaintiff with respect to some charges including N.Y. PL 110/125.25(1) 'Attempted Murder in the second degree', N.Y. PL 120.10(1) 'Assault in the first degree'.

137.    On May 25, 2011, a mistrial was declared as to the remaining charges against the plaintiff.

138.    When the jury was polled, it was announced that the jurors voted 11 to 1 in favor of acquittal.

139.    After the mistrial but before the second trial, the prosecutor offered the plaintiff a term of two to four years in exchange for a guilty plea to attempted assault in the second degree.

140.    Had the plaintiff accepted the offer, he would likely have been released immediately after the first trial having been incarcerated for over two years at the time.

141.    Plaintiff, however, declined the offer maintaining his innocence.

142.    Plaintiff proceeded to a second trial to clear his name.

The second trial proceedings

143.    Plaintiff's second trial commenced with jury selection on October 26, 2011, in the Supreme Court, Bronx County.

144.    There was no video surveillance and Ms. Shepherd, the complaining victim, was not able to identify the shooter.

145.    The prosecution's case thus relied heavily on Ms. Williams who claimed to know the plaintiff from the neighborhood.

146.    The in-court identifications by Mses. Williams and Shepherd were challenged by defense as unreliable and incredible.

147.    Aside from eliciting testimony indicating that Ms. Williams did not know the plaintiff and did not see him at any time prior to and/or on August 29, 2008 and August 30, 2008, respectively, defense also presented an investigator who measured the plaintiff's height[1] and took crime scene measurements that undermined Mr. Williams's claimed observations.

148.    Thus, Ms. Williams's reliability appeared to be a concern to the jurors who requested her entire testimony to be read back during deliberations.

149.    The jury also asked for pictures of the porch where the shooting allegedly occurred, and asked for the measurements taken by the investigator.

150.    The aforesaid firearm recovered near the crime scene appeared to be the only potentially objective piece of evidence linking the perpetrator to the crime.

151.    Firearm and toolmark identification evidence confirmed that the gun was used in the offense but no known suspect was linked to the gun by the tests.

152.    DNA testing was thus used by the prosecution to attempt to identify the person who shot the complainant with the gun, which would then bolster Ms. Williams's challenged testimony.

153.    A mixture of DNA on the slide/slide release of the gun led to an inculpatory statistic as to the plaintiff.

154.    DNA evidence was therefore important to the prosecution's case as powerful scientific evidence corroborating Ms. Williams's identification.

155.    Assistant District Attorneys Guarnieri and Singer worked closely with Ho, Dr. Lien, Dr. O'Connor, and OCME in testing and comparing the DNA mixtures.

---

[1] Plaintiff is approximately eleven feet tall.

156.    After a presentation of evidence that lasted several weeks (including the summations), the criminal court submitted two counts of criminal possession of weapons in the second degree and one count of assault in the second degree.

157.    As in the first trial proceedings, the jury deliberated for several days.

158.    After several days of deliberations, the jury indicated that it was deadlocked on the assault count.

159.    When prompted by the criminal court, the jury clarified that it was deadlocked on the assault count but had reached a verdict on the weapons charges.

160.    The criminal court then instructed the jury to "continue further deliberations upon the entire case" and appeared to urge the jurors to try to reach an unanimous verdict.

161.    On December 1, 2009, the jury found plaintiff guilty of all three counts -- two counts of criminal possession of weapons in the second degree and one count of assault in the second degree.

Plaintiff received the maximum sentence

162.    On January 11, 2012, the criminal court sentenced the plaintiff to fifteen years in prison followed by five years post-release supervision as to the two counts of criminal possession of weapons in the second degree, and seven years in prison followed by five years post-release supervision as to the one count of assault in the second degree with all counts to run concurrent with each other.

163.    On September 10, 2014, plaintiff filed a motion pursuant to N.Y. CPL 440.20(1) and 440.30(3) ("motion") seeking to set aside the sentence on the ground that his defense attorney rendered ineffective assistance of counsel when he failed to challenge the constitutionality of a 2004 conviction that had been used to enhance his sentence.

164.    On August 13, 2015, the criminal court granted the motion.

165.    At a resentence hearing held on October 29, 2015, the criminal court concluded that the plaintiff was not a second violent felony offender.

166.    Notwithstanding that conclusion, the criminal court still sentenced the plaintiff to fifteen years in prison followed by five years post-release supervision as to the two counts of criminal possession of weapons in the second degree, and seven years in prison followed by three years post-release supervision as to the one count of assault in the second degree with all counts to run concurrent with each other.

167.    Plaintiff's appeal(s) of his conviction and habeas corpus petition were dismissed.

Plaintiff's 440 motion

168.    On August 26, 2019, long after the plaintiff's direct appeal had been dismissed by the New York State Supreme Court, Appellate Division, First Department, prosecutors wrote to the defense disclosing, for the first time, that OCME used CPI in analyzing the DNA evidence with respect to the evidence tested under FB08-05681.

169.    On or about September 29, 2020, plaintiff's assigned appellate counsel, the Center for Appellate Litigation (CAL), filed a motion pursuant to N.Y. CPL 440.10 to vacate plaintiff's conviction ("motion to vacate").

170.    The bases for the motion to vacate include, as relevant herein:[2] (a) newly discovered errors in the testing indicating that the DNA evidence should not have been admitted at the trial because it was a complex, low level mixture that should not have been interpreted; (b) the use of CPI on the LCN mixture was not generally accepted as reliable in the forensic science community and did not produce reliable result in the underlying criminal matter; (c) OCME never validated LCN for use in the underlying criminal matter, which is a mandatory requirement for the use of DNA in casework in New York State, but lied that it did validate LCN for use in the underlying criminal matter; (d)

_____

[2] The motion to vacate also argued that plaintiff's trial attorney provided ineffective assistance.

defendants failed to disclose that OCME protocols had changed between the report issued as to the initial examination of the evidence (November 5, 2008) and the comparison to plaintiff's DNA profile (November 4, 2010) and generating the CPI statistic (December 14, 2010). Under the later 24 protocols in place at the time of the comparison, generation of the CPI statistic and trial, OCME could not report a possible inclusion or a statistic as to the sample in the underlying criminal matter; and (e) defendants offered misleading forensic evidence created by OCME—that is, a "government agency" that played a critical role in the trial. That misleading report and testimony at trial stated that these samples were properly tested even though OCME had never in fact validated LCN for use in such low quantity and quality samples. The report misled the defense regarding critical DNA evidence, thus undermining the integrity of the underlying criminal trial. Thus, the motion to vacate concluded that defendants violated plaintiff's due process rights and his constitutional right to disclosure of evidence favorable to the defense under *Brady v. Maryland*, 373 U.S. 83 (1963).

171.    By a decision dated August 2, 2021, the criminal court granted an evidentiary hearing only as to the ineffective assistance claims, which was scheduled for November 5, 2021. The criminal court noted that the plaintiff's "remaining claims will be addressed in a separate decision."

172.    On November 5, 2021, the DNA expert witness retained by the plaintiff, Dr. Charlotte Word, testified at the evidentiary hearing and pointed out errors in the allele table generated by OCME and explained that the 25 allele that appeared in two of the runs of the slide/slide release was not included in the composite profile. Adding this 25 to the composite resulted in two loci (D2 and FGA) with 7 alleles in the composite. Because OCME's protocols provided that samples with 7 or more alleles at 2 or more loci are not to be compared, Dr. Word testified that this sample should not have been compared to the plaintiff and that COME should not have generated a CPI statistic. Dr. Word also testified that she would deem the OCME's sample inconclusive due to the number of contributors and the low amount of DNA

and that it was improper to use CPI on the LCN sample because of the likelihood of allelic dropout.

173.     After hearing Dr. Word's testimony, defendants conceded that the allele table contained errors and the prosecutor sought an adjournment in order to afford OCME sufficient time to conduct further analysis and issue new reports.

174.     On December 7, 2021, the criminal court, on consent, vacated the January 11, 2012 judgment convicting the plaintiff of two counts of criminal possession of weapons in the second degree and one count of assault in the second degree and ordered a new trial.

175.     On January 28, 2022, the false charges levied against the plaintiff were dismissed and sealed.

Plaintiff sustained significant damages and injuries

176.     Plaintiff's injuries and damages include, but are not limited to, his:
a.  Wrongful arrest, prosecution, and conviction for robbery;
b.  Loss of or restrictions on his liberty including nearly thirteen years of incarceration beginning from his arrest through his conviction;
c.  Loss of the services, society, companionship, and consortium of his family and friends;
d.  Physical injuries and suffering;
e.  Past and future mental and emotional suffering; and
f.  Past and future loss or diminution of employment earnings in an amount determined by an economic expert to be over $1,000,000.00

FIRST CAUSE OF ACTION: MALICIOUS PROSECUTION - against the individual defendants

177.  By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 176 of this complaint as though fully set forth herein.

178.  The individual defendants falsified records and coerced witness statements, and the NYPD defendants promoted Messrs. Williams and Shepherd as grand jury witnesses to the prosecutors despite knowing that they had already lied about the plaintiff's involvement in the shooting.

179.  Relying upon the falsified records and coerced witness statements, the prosecutors initiated criminal actions against the plaintiff and presented the charges against the plaintiff directly to the grand jury.

180.  Relying on the falsified records, coerced witness statements, and the testimony of Messrs. Williams and Shepherd the grand jury returned a true bill of indictment against the plaintiff.

181.  Following the arrest and initial arraignment, plaintiff was remanded and was incarcerated for several years thereafter.

182.  Plaintiff was required to, and did, appear in court on multiple occasions to defend himself from the false charges levied against him with malice by defendants.

183.  The conduct of defendants, as described herein, amounted to malicious prosecution.

184.  Eventually, the proceeding(s) terminated in favor of plaintiff Marcus.

185.  Because of the conduct of the defendants, plaintiff was maliciously prosecuted for a lengthy period of time.

186.  Such conduct described herein violated plaintiff's rights under 42 U.S.C. §§ 1983 and 1988 and the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

187.  Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

SECOND CAUSE OF ACTION: FABRICATION OF EVIDENCE - against the individual defendants

188.     By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 187 of this complaint as though fully set forth herein.

189.     The individual defendants manufactured evidence of criminality against the plaintiff likely to influence a jury's decision which the prosecutors relied upon to initiate criminal actions against him.

190.     In addition to other things, defendant officers falsely stated to the prosecutors that plaintiff was identified from a properly conducted identification procedure and that a mixture of DNA on the slide/slide release of the gun led to an inculpatory statistic as to the plaintiff.

191.     Plaintiffs were deprived of their liberty as a result.

192.     The conduct of the individual defendants, as described herein, amounted to fabrication of evidence and denial of liberty, due process, and a fair trial.

193.     Such conduct described herein violated plaintiff's rights under 42 U.S.C. §§ 1983 and 1988 and the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

194.     Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

THIRD CAUSE OF ACTION: UNREASONABLE DETENTION - against the individual defendants

195.     By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 194 of this complaint as though fully set forth herein.

196.     Defendant officers denied plaintiffs their due process right to be free from continued detention after it was known or should have been known that plaintiffs were entitled to release.

197.     The conduct of defendant officers, as described herein, amounted to unreasonable detention.

198.	Such conduct described herein violated plaintiffs' rights under 42 U.S.C. §§ 1983 and 1988 and the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

199.	Consequently, plaintiffs have been damaged and hereby demand compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

FOURTH CAUSE OF ACTION: FAILURE TO INTERVENE - against the individual defendants

200.	By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 199 of this complaint as though fully set forth herein.

201.	That each and every officer and/or individual who responded to, had any involvement and/or was present at the location of the arrest, assault and/or incident described herein knew and was fully aware that the plaintiff did not commit any crime or offense, and had a realistic opportunity to intervene to prevent the harm detailed above from occurring.

202.	Nonetheless, defendants did absolutely nothing to discourage and prevent the harm detailed above from occurring and failed to intervene.

203.	Such conduct described herein violated plaintiff's rights under 42 U.S.C. §§ 1983 and 1988 and the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

204.	Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

FIFTH CAUSE OF ACTION: FAILURE TO TRAIN/SUPERVISE/DISCIPLINE/SCREEN AND MUNICIPAL POLICY - against defendant City

205.	By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 204 of this complaint as though fully set forth herein.

206.	Defendant City, acting through NYPD, had actual and/or de facto policies, practices, customs and/or usages of using private information from sealed arrests to target and unlawfully re-arrest and charge individuals who are

members of racial/ethnic minority groups such as plaintiff, who is black, as repeat offenders.

207.    As was recently observed by Niji Jain, an attorney at the Bronx Defenders, "the NYPD has been using private information from sealed arrests in over a dozen of their interconnected surveillance databases" to target and unlawfully re-arrest and charge individuals who are members of racial/ethnic minority groups as repeat offenders. *See* CityLimits, NYPD Can No Longer Access Sealed Arrest Records Without Court Order, Judge Rules, https://citylimits.org/2021/09/28/nypd-can-no-longer-access-sealed-arrest-records-without-court-order-judge-rules/ (last visited January 8, 2024).

208.    The NYPD's "unlawful use of these records has primarily harmed Black and brown New Yorkers who bear the brunt of the NYPD's over-policing of low-income communities of color." *See* CityLimits, Opinion: The NYPD's Abuse of Sealed Arrest Records Jeopardizes All New Yorkers, https://citylimits.org/2023/04/20/opinion-the-nypds-abuse-of-sealed-arrest-records-jeopardizes-all-new-yorkers/#:~:text=%E2%80%9CLast%20month%2C%20a%20New%20York, for%20the%20past%2046%20years.%E2%80%9D (last visited January 8, 2024).

209.    In a decision issued in *R. C. v. City of New York* (Index No. 153739/2018), concerning the plaintiffs' motion for preliminary injunction to, among other things, restrain and enjoin defendants from instructing NYPD personnel that they may access and use sealed arrest information without a court order and to require defendants to issue a FINEST training message stating that NYPD personnel may not access and use sealed arrest information without a court order, the court observed, among other things, that the "defendants freely admit that their prior training regarding the sealing of records was contrary to law" and that "the NYPD did not properly train [its police officers] as to the sealing statutes".

210.    Relying upon City's policy and practices and the fact that it has failed to properly train the individual defendants as to the sealing statutes, the NYPD

defendants targeted and unlawfully arrested the plaintiff and thereafter falsely charged him with multiple crimes as a repeat offender.

211.    In addition, the City, acting through aforesaid NYPD, had actual and/or de facto policies, practices, customs and/or usages of wrongfully arresting, illegally stopping, frisking, searching, seizing, abusing, humiliating, degrading and/or maliciously prosecuting individuals who are members of racial/ethnic minority groups, such as plaintiff, on the pretext that they were involved in crimes.

212.    The existence of the aforesaid unconstitutional policies, practices, customs and/or usages may be inferred from repeated occurrences of similar wrongful conduct.

213.    Defendant City has settled numerous lawsuits in this district against several police officers assigned to the NYPD-46th Precinct alleging, among other things, that the police officers unlawfully stooped and frisked, falsely arrested, and maliciously prosecuted the plaintiffs without probable cause.

214.    Despite the numerous complaints of civil rights violations described hereinabove, there has been no meaningful attempt on the part of defendant City to forestall further incidents and/or even to investigate claims that police routinely fabricate evidence, arrest innocent citizens without probable cause, and use excessive force in the arrest of innocent citizens.

215.    As a result of defendant City's failure to properly train, supervise or discipline its police officers, the individual defendants unlawfully arrested the plaintiff, incarcerated him, and abused and/or assaulted the plaintiff.

216.    Defendant City maintained the above described policies, practices, customs or usages knowing fully well that the policies, practices, customs or usages lead to improper conduct by its police officers and employees. In failing to take any corrective actions, defendant City acted with deliberate indifference, and its failure was a direct and proximate cause of plaintiff's injuries as described herein.

217.    The actions of defendants, acting under color of State law, deprived plaintiff of his due process rights, and rights, remedies, privileges, and immunities

under the laws and Constitution of the United States, treatise, ordinances, customary international law and norms, custom and usage of a right; in particular, the right to be secure in their person and property, to be free from abuse of process, the excessive use of force and the right to due process.

218.    By these actions, defendants have deprived plaintiff of rights secured by treatise, ordinances, customary international law and norms, custom and usage of a right, and the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. §§ 1983 and 1988.

SIXTH CAUSE OF ACTION: NEW YORK STATE CONSTITUTION, ARTICLE I, §§ 5, 6, 8, 11 & 12 - against defendants

219.    By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 218 of this complaint as though fully set forth herein.

220.    By reason of the foregoing, and by arresting, detaining and imprisoning plaintiff without probable cause or reasonable suspicion, and harassing and assaulting him and depriving him of due process and equal protection of laws, defendants deprived plaintiff of rights, remedies, privileges, and immunities guaranteed to every New Yorker by Article I, § 5 (prohibiting cruel and unusual punishments), Article 1, § 6 (providing for due process), Article 1, § 8 (guaranteeing freedom of speech), Article 1, § 11 (prohibiting discrimination in civil rights and providing for equal protection of laws) & Article I, § 12 (prohibiting unreasonable searches & seizures) of the New York Constitution.

221.    In addition, the individual officers conspired among themselves and conspired with other individuals to deprive plaintiffs of his constitutional rights secured by Article I, §§ 5, 6, 8, 11 & 12 of the New York Constitution, and took numerous overt steps in furtherance of such conspiracy, as set forth above.

222.    The individual officers acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as officers, agents, or employees. The individual officers' acts were beyond the scope of their jurisdiction, without authority

of law, and in abuse of their powers. The individual officers acted willfully, knowingly, and with the specific intent to deprive plaintiff of his constitutional rights secured by Article I, §§ 5, 6, 8, 11 & 12 of the New York Constitution.

223.    Defendants, their officers, agents, servants, and employees were responsible for the deprivation of plaintiff's state constitutional rights.

SEVENTTH CAUSE OF ACTION: TORTS (MALICIOUS PROSECUTION) - against defendants

224.    By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 223 of this complaint as though fully set forth herein.

225.    The conduct of the defendants, as described herein, amounted to malicious prosecution.

226.    Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

EIGHTH CAUSE OF ACTION: TORTS (NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS) - against defendants

227.    By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 226 of this complaint as though fully set forth herein.

228.    The defendants engaged in extreme and outrageous conduct, intentionally and recklessly causing severe emotional distress to plaintiff.

229.    Plaintiff's emotional distress have damaged his personal and professional live because of the severe mental pain and anguish which were inflicted through deliberate and malicious actions including the arrest, assault, detention, and imprisonment by defendants.

230.    Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

NINTH CAUSE OF ACTION: NEGLIGENT HIRING AND RETENTION OF EMPLOYMENT SERVICES - against defendant City

231.    By this reference, plaintiffs incorporate each and every allegation and averment set forth in paragraphs 1 through 230 of this complaint as though fully set forth herein.

232.    Upon information and belief, defendant City failed to properly train, supervise or discipline its agents, servants, employees, officers and/or representatives, including the individual defendants, concerning correct practices in conducting investigations, the proper DNA testing procedures, obligation not to promote or condone perjury and/or assist in the prosecution of innocent persons and obligation to effect an arrest only when probable cause exists for such arrest.

233.    Upon information and belief, defendant City failed to properly screen, hire and/or retain the individual defendants.

234.    Upon information and belief, defendant City, through its various agencies and departments including the defendants in this action, owed a duty of care to plaintiff to prevent the physical and mental abuse sustained by plaintiff.

235.    Upon information and belief, defendant City, through its various agencies and departments including the defendants in this action, owed a duty of care to plaintiff because under the same or similar circumstances a reasonable, prudent and careful person should have anticipated that an injury to plaintiff or to those in a like situation would probably result from such conduct described herein.

236.    Upon information and belief, defendant City knew or should have known through the exercise of reasonable diligence that defendant officers were not prudent and were potentially dangerous.

237.    Upon information and belief, defendant City's negligence in screening, hiring and retaining defendant officers proximately caused plaintiff's injuries.

WHEREFORE, plaintiffs respectfully pray judgment as follows:

a.    For compensatory damages against all defendants in an amount to be proven at trial;

b.      For exemplary and punitive damages against all defendants in an amount to be proven at trial;

c.      For costs of suit herein, including plaintiff's reasonable attorney's fees; and;

d.      For such other and further relief as the court deems proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury.

Dated: Brooklyn, New York
          February 15, 2024

                         UGO UZOH, P.C.


                         By:    _____
                                Ugochukwu Uzoh
                                Attorney for the Plaintiff
                                56 Willoughby Street, Third Floor
                                Brooklyn, N.Y. 11201
                                Tel. No: (718) 874-6045
                                Fax No: (718) 576-2685
                                Email: u.ugochukwu@yahoo.com