UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

MARKUS KING-KNIGHT,

                          Plaintiff,                              23-cv-4648 (PKC)

          -against-                                      OPINION AND ORDER

THE CITY OF NEW YORK, et al.,

                          Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.,

          Plaintiff Markus King-Knight was convicted of two counts of criminal possession
of a weapon in the second degree and one count of assault in the second degree.  Ten years later,
the state court set aside his conviction, on consent, on a claim of ineffective assistance of counsel
premised upon the failure to challenge unreliable DNA evidence.  Shortly thereafter, the charges
against King-Knight, who had served 13 years, were dismissed.

          King-Knight brings section 1983 claims against detectives Stephen Geary and
Miguel Bencosme of the New York City Police Department ("NYPD") in their official and
individual capacities (the "NYPD defendants"), New York City Office of Chief Medical
Examiner ("OCME") analysts Diana Ho, Dr. Eugene Y. Lien, and Dr. Craig O'Connor in their
official and individual capacities (the "OCME defendants"), and Bronx County District
Attorney's Office assistant district attorneys Debra A. Guarnieri and Rachel S. Singer in their
official and individual capacities (the "ADA defendants") alleging that they deprived him of
rights under various constitutional provisions.  42 U.S.C. § 1983.  King-Knight also brings a
municipal liability claim under section 1983 against the City of New York.  He adds related

claims under New York state law against the NYPD, OCME, and ADA defendants and the City of New York (collectively "defendants").[1]

Defendants move to dismiss all claims against them.  For reasons that will be explained, the Court will grant defendants' motion.

BACKGROUND

For the purposes of defendants' motion to dismiss, the Court accepts well-pleaded allegations in King-Knight's Amended Complaint as true and draws all reasonable inferences in King-Knight's favor.  See Koch v. Christie's Intern. PLC, 699 F.3d 141, 145 (2d Cir. 2012).

A. The Amended Complaint's Allegations Against the NYPD Defendants

In the early hours of August 30, 2008, Colleen Shepherd was shot while leaving a house party in the Bronx, New York.  (ECF 41 ¶¶ 25, 43, 46, 56.)  Her friend, Nikita Williams, had been in a verbal altercation with a group of men who were also leaving the party.  (Id. ¶¶ 30, 53.)  Within a few minutes, someone from the group fired several gunshots in Shepherd's and Williams's direction, striking Shepherd in the back as the pair attempted to re-enter the house. (Id. ¶¶ 54-56.)  Once they made it back inside, Williams called 911.  (Id. ¶ 63.)  She told the 911 operator that Shepherd had been shot by "an unknown [B]lack male wearing hair braids."  (Id. ¶ 64.)  Before being transported to the hospital, Shepherd similarly told Emergency Medical Services personnel and the first NYPD officers to arrive that she was shot by "a [B]lack male wearing a red shirt and blue pants with short hair braids."  (Id. ¶¶ 68-69.)

The NYPD set out to investigate the shooting.  A firearm was recovered from a nearby address and turned over to Geary.  (Id. ¶¶ 71-72.)  Geary turned over the firearm to a

---

[1] King-Knight also purports to bring his claims against defendants "John Doe and Jane Doe #1-10."  The Amended Complaint does not make any allegations against the Doe defendants.  To date, no Doe defendant has been identified or served.  The time for service on a defendant has expired under Rule 4(m), Fed. R. Civ. P.  For these reasons, the Court dismisses the Doe defendants.

member of the NYPD "Evidence Collection Team." (Id. ¶¶ 73-74.) On the same morning as the
shooting, the NYPD interviewed Williams for the first time at the hospital where Shepherd had
been taken. (Id. ¶ 77.) Williams described the shooter as a "short [B]lack male in his early
twenties with a stocky build wearing hair braids" and added that he had "a black handgun and
was at the party, but she did not know him." (Id. ¶¶ 79-80 (emphasis omitted).) Later that
morning, Geary also interviewed Williams at the NYPD precinct. (Id. ¶ 88.) Williams told him
that the shooter belonged to the Blood street gang, that he was Black, and that he had a height of
5 feet 6 inches or 5 feet 7 inches. (Id. ¶ 89.)

         A few hours after interviewing Williams, Geary canvassed the area around the
scene of the shooting. (Id. ¶ 90.) Although Geary did not locate any witnesses, he claimed that
while he was still in the area he was approached by an unknown Black female. (Id. ¶¶ 90-91.)
Geary claimed that the woman told him that "she heard that the shooter was a male [B]lack
named Marcus and that his last name may be King." (Id. ¶ 92 (emphasis omitted).) According
to Geary, he then obtained photos from the "photo manager . . . of male [B]lacks named
Marcus," including one of King-Knight. (Id. ¶ 93.) The photo he obtained of King-Knight was a
mugshot from a sealed arrest that took place about seven months before the shooting. (Id. ¶ 94.)
Geary documented his canvass of the area near the shooting and the photos that he obtained from
the "photo manager." (Id. ¶ 101.) King-Knight alleges that "[t]he unknown [B]lack female was
manufactured and/or created by Geary and did not exist at any time." (Id. ¶ 98.) He asserts that
Geary and Bencosme "simply identified [him] as a suspect and immediately began to frame him
as the shooter." (Id. ¶ 99.)

         In the days that followed, King-Knight claims that Geary and Bencosme "were
busy spreading word . . . that they had identified [him] as the sole suspect and/or perpetrator of

the shooting." (Id. ¶¶ 101-02.) King-Knight alleges that Geary and Bencosme "then began spoon-feeding witnesses false information during pre-interviews for repetition in official statements and began to coerce witnesses to falsely implicate [him]." (Id. ¶ 103.) King-Knight also alleges that they "falsified some of the witnesses' statements." (Id. ¶ 105.)

On September 9, 2008, Geary and Bencosme arranged to meet with Williams. (Id. ¶ 106.) King-Knight claims that, prior to their meeting, Geary and Bencosme told Williams that "they had a photo of the shooter named Marcus and that they were bringing the photo of the shooter so she could look at it and place her initials on the paper." (Id. ¶ 107.) Geary gave Williams the sealed photo of King-Knight and asked her to initial it while she was seated in the back of Geary's and Bencosme's police car. (Id. ¶ 113.) Geary and Bencosme did not redact King-Knight's arrest information or personal details before the mugshot was shared with Williams. (Id. ¶ 114.) King-Knight alleges that this was intentional and part of "their pattern and practice of spoon-feeding and coercing witnesses to falsely implicate [him]." (Id. ¶¶ 115-16.)

Geary documented the September 9 meeting in his "DD-5 Follow-Up No. 22." (Id. ¶ 118.) Geary wrote that after receiving King-Knight's mugshot Williams "'identified the photo of Marcus King' and informed [Geary and Bencosme] that she 'was told that the perp's name is Marcus' and that she 'has known of him and seen him in the neighborhood for years.'" (Id.) After the meeting, Geary issued an "investigation card (ICARD)" for King-Knight's arrest. (Id. ¶ 119.)

Geary claimed that he also had a telephone conversation with Shepherd on February 14, 2009. (Id. ¶¶ 109-10.) According to Geary, Shepherd "state[d] she does not have any additional information on the perp." (Id. ¶ 110.)

King-Knight was arrested on April 30, 2009.  (Id. ¶ 123.)  King-Knight alleges that the NYPD defendants never "conduct[ed] any proper identification procedures and, therefore, [he] was never identified by any victim or witness as the shooter or perpetrator of the August 30, 2008 shooting at any time prior to his arrest."  (Id. ¶ 124.)  On May 15, 2009, King-Knight was indicted by a grand jury for attempted murder, assault, and criminal possession of a weapon.  (Id. ¶ 128.)  King-Knight claims that in indicting him the grand jury relied on the NYPD defendants' "falsified records and coerced witness statements including the testimony of Mses. Williams and Shepherd -- who had become well rehearsed liars and who were promoted by NYPD defendants."  (Id.)

The New York Supreme Court, Bronx County, Criminal Term, affirmed the sufficiency of the grand jury indictment in a Decision and Order dated December 11, 2009.[2] (ECF 51-6 at 2.)  The court concluded that "[t]he evidence before the grand jury was sufficient to support each and every count in the indictment."  (Id.)  In the same Decision and Order, the court granted King-Knight's motion to inspect the grand jury minutes.  (Id.)

On April 27 and April 28, 2011, Geary and Williams testified at a pre-trial hearing held pursuant to People v. Rodriguez, 79 N.Y.2d 445 (1992) regarding Williams's familiarity with King-Knight prior to the shooting, i.e., whether there was an independent basis for an in-court identification untainted by the showing of the single photo.  (ECF 41 ¶¶ 129-30.) King-Knight alleges that at the Rodriguez hearing, Geary, "who had consistently lied to the prosecutors that he conducted a proper single photo identification procedure" when he met with

---

[2] Defendants have attached the Decision and Order as an exhibit to their motion to dismiss.  (ECF 51-6.)  The Court may take judicial notice of the Decision and Order.  See Johnson v. Pugh, 11-cv-385 (RRM) (MDG), 2013 WL 3013661, at *2 (E.D.N.Y. June 18, 2013) ("A court may take judicial notice of matters of public record, including . . . decisions in prior state court adjudications, on a motion pursuant to Rule 12(b)(6)."); see also Hooks v. City of New York, 21-cv-10771 (JGK), 2022 WL 16964010, at *4 (S.D.N.Y. Nov. 16, 2022) (stating that when a court takes judicial notice of materials from a state court action "it does so only to determine what statements the public records contained, not to establish the truth of the matters asserted therein").

Williams on September 9, 2008, "lied" about what Williams had told him about King-Knight prior to that meeting.  (Id. ¶ 129.)  According to Geary, Williams had given him a description of King-Knight, said that she had known King-Knight for a few years, and told him that she and her baby's father had played video games with King-Knight at her baby's father's grandmother's house several times a week for a number of years.  (Id.)  Williams testified that she had only seen King-Knight "once for a brief moment" at her baby's father's grandmother's house and that she had not told Geary that she knew King-Knight or that he was the shooter "until after Geary showed her [his] mugshot."  (Id. ¶ 130.)  Although the state court determined that "Geary's single photo identification was totally improper and unconstitutionally suggestive," it decided to allow for the in-court identification of King-Knight at trial.  (Id. ¶ 131.)

B. The Amended Complaint's Allegations Against the ADA and OCME Defendants

   King-Knight's first trial began in May 2011 in the Bronx Supreme Court.  (Id. ¶ 132.)  Guarnieri was the assigned prosecutor, and Singer was the assistant prosecutor.  (Id. ¶ 133.)  The jury ultimately acquitted King-Knight of certain charges, including attempted murder in the second degree and assault in the first degree, but was unable to reach a verdict as to the remaining charges.  (Id. ¶¶ 135-37.)  Following the mistrial, King-Knight declined an offer to enter into a plea agreement.  (Id. ¶¶ 139, 141.)

   King-Knight's second trial began in October 2011.  (Id. ¶ 143.)  Williams and Shepherd both made in-court identifications of King-Knight.  (Id. ¶ 146.)  Williams "claimed to know [King-Knight] from the neighborhood."  (Id. ¶ 145.)  The defense challenged their in-court identifications as "unreliable and incredible."  (Id. ¶ 146.)  The defense elicited testimony indicating that Williams had not known or seen King-Knight prior to the shooting.  (Id. ¶ 147.)  The defense also presented an investigator who took measurements of King-Knight's height and

the crime scene that undermined Williams's claimed observations.  (Id.)  King-Knight alleges

that Williams's reliability appeared to be of concern to the jury.  (Id. ¶¶ 148-49.)

      The firearm that was recovered near the scene of the shooting "appeared to be the

only potentially objective piece of evidence linking the perpetrator to the crime."  (Id. ¶ 150.)

"Firearm and toolmark identification evidence" had confirmed that the firearm was used in the

shooting, but those tests had not linked the firearm to any known suspect.  (Id. ¶ 151.)  King-

Knight claims that "DNA testing was thus used by the prosecution to attempt to identify the

person who shot [Shepherd], which would then bolster Ms. Williams's challenged testimony."

(Id. ¶ 152.)  The DNA evidence introduced during King-Knight's second trial was based on two

techniques: Low Copy Number ("LCN") testing and the Combined Probability of Inclusion

("CPI").  (Id. ¶ 170.)  On November 5, 2008, OCME had issued a report as to its initial

examination, using LCN, of DNA from the "slide/slide release" of the firearm.  (See id. ¶¶ 153,

170.)  On November 4, 2010, OCME made a comparison to King-Knight's DNA profile.  (Id. ¶

170.)  On December 14, 2010, it used CPI to generate an "inculpatory statistic" as to King-

Knight.  (See id. ¶¶ 153, 170.)  King-Knight claims that "Guarnieri and Singer worked closely

with Ho, Dr. Lien, Dr. O'Connor, and OCME in testing and comparing the DNA mixtures."  (Id.

¶ 155.)  He alleges that the DNA evidence was "important to the prosecution's case as powerful

scientific evidence corroborating Ms. Williams's identification."  (Id. ¶ 154.)

      On December 1, 2011, [3] the jury found King-Knight guilty on two counts of

criminal possession of a weapon in the second degree and one count of assault in the second

degree.  (Id. ¶ 161.)  He was ultimately sentenced to 15 years in prison on the two counts of

criminal possession of a weapon and 7 years in prison on the assault count, all to run

---

[3] As defendants' memorandum of law in support of their motion recognizes, the Amended Complaint mistakenly states that the jury returned its guilty verdict on December 1, 2009.  (ECF 53 at 12 n.4.)

concurrently.  (Id. ¶ 166.)  King-Knight's subsequent appeal of his conviction and habeas corpus petition were unsuccessful.  (Id. ¶ 167.)

Almost eight years later, on August 26, 2019, prosecutors disclosed to the defense for the first time that OCME used CPI in analyzing the DNA evidence from the firearm.  (Id. ¶ 168.)  On September 29, 2020, King-Knight's appellate counsel moved to vacate his conviction based on the ineffective assistance of his trial counsel, which failed to "shield [King-Knight] from unreliable and prejudicial scientific evidence and to pursue viable defenses."[4]  (Id. ¶ 169; ECF 51-7 at 3.)  King-Knight, who draws from that motion, alleges that OCME's use of CPI "was not generally accepted as reliable in the forensic science community" and that OCME "never validated LCN for use in the underlying criminal matter," which is a "mandatory requirement" in New York State.  (ECF 41 ¶ 170.)  He also claims that "defendants" did not disclose that "OCME protocols" had changed between OCME's report in 2008 and the comparison to King-Knight's DNA profile and generation of the CPI statistic in 2010.  (Id.)  According to King-Knight, "[u]nder the later 24 protocols in place . . . OCME could not report a possible inclusion or a statistic as to the sample in the underlying criminal matter."  (Id.)  King-Knight asserts that OCME "lied" that it had validated LCN and that "defendants offered misleading forensic evidence created by OCME."  (Id.)

Following King-Knight's motion to vacate, the state court granted an evidentiary hearing as to the ineffective assistance claims.  (Id. ¶ 171.)  At the hearing, King-Knight's DNA

---

[4] Defendants have attached as an exhibit to their motion to dismiss an excerpt from the Memorandum of Law submitted by King-Knight in support of his motion to vacate.  (ECF 51-7.)  Because the Amended Complaint explicitly references the motion to vacate and recites several of "[t]he bases for the motion," (ECF 41 ¶¶ 169-70), the Court deems the excerpt from the Memorandum of Law to be incorporated by reference in the Amended Complaint.  See Atlas Partners, LLC v. STMicroelectronics, International N.V., 14-cv-7134 (VM), 2015 WL 4940126, at *7 (S.D.N.Y. Aug. 10, 2015) ("For the documents to be incorporated by reference, the plaintiff must make a clear, definite and substantial reference to the documents.") (citation and internal quotation marks omitted).  Accordingly, it is appropriate for the Court to consider the excerpt in resolving defendants' motion.

expert testified that OCME committed errors in its testing and that its protocols did not permit the comparison to King-Knight's DNA profile and the generation of a CPI statistic.  (Id.)  On December 7, 2021, the state court, on consent, vacated King-Knight's conviction.  (Id. ¶ 174.) On January 28, 2022, the charges brought against King-Knight were dismissed and sealed.  (Id. ¶ 175.)

C. Procedural History

King-Knight filed the Amended Complaint on February 15, 2024, asserting claims against the NYPD, OCME, and ADA defendants under section 1983 for malicious prosecution, fabrication of evidence, "unreasonable detention," and failure to intervene and under state law for violations of the New York State Constitution, malicious prosecution, and negligent and intentional infliction of emotional distress.  (Id. at 21-27.)  King-Knight also asserts claims against the City of New York under section 1983 for municipal liability and under state law for negligent hiring and retention of employment services.  (Id. at 23-26, 28.)

Defendants move to dismiss the Amended Complaint in its entirety pursuant to Rule 12(b)(6), Fed. R. Civ. P.  Defendants contend that the ADA and OCME defendants are entitled to absolute or qualified immunity, that the NYPD defendants are entitled to qualified immunity, and that King-Knight's claims are not viable under the governing law.  In addition to opposing the motion to dismiss, King-Knight has submitted a proposed second amended complaint.  (ECF 61-1 at 2-33.)  On January 18, 2024, the Court approved and adopted an agreement between the parties whereby defendants consented to King-Knight's filing of the Amended Complaint on the condition that he would seek no further amendments "except for amendments based on information that could not have been available to the plaintiff at the time the [A]mended [C]omplaint is filed."  (ECF 40 at 1.)  Thus, the first Amended Complaint is the

operative complaint and not the proposed second amended complaint as to which leave to amend has never been granted.  As will be seen, the Court ultimately concludes that the filing of the proposed second amended complaint would be futile.

LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  The Court must examine only the well-pleaded factual allegations, disregarding any legal conclusions, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 678-79.  However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," dismissal is appropriate. Id. at 679.

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), "a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993)).

DISCUSSION

A. The ADA Defendants are Entitled to Absolute Immunity

Section 1983 "purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights." Kalina v. Fletcher, 522 U.S. 118, 123 (1997).  Nonetheless, absolute immunity bars section 1983 suits brought against

prosecutors in their individual capacities "for advocatory conduct that is 'intimately associated with the judicial phase of the criminal process.'" Giraldo v. Kessler, 694 F.3d 161, 165 (2d Cir. 2012) (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). For instance, "the Supreme Court has found prosecutors absolutely immune from suit for alleged misconduct during a probable cause hearing, in initiating a prosecution, and in presenting the State's case." Flagler v. Trainor, 663 F.3d 543, 547 (2d Cir. 2011) (citations omitted). At the same time, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." Warney v. Monroe County, 587 F.3d 113, 121 (2d Cir. 2009) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993)). A prosecutor's "investigative acts" not entitled to absolute immunity "are those undertaken in the phase of law enforcement that involves the gathering and piecing together of evidence for indications of criminal activities and determination of the perpetrators." Giraldo, 694 F.3d at 166. In turn, "ascertain[ing] the prosecutors' functional role . . . depends chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate." Warney, 587 F.3d at 123. The ultimate question is "whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor." Ogunkoya v. Monaghan, 913 F.3d 64, 69 (2d Cir. 2019) (quoting Giraldo, 694 F.3d at 166).

The Court concludes that the alleged actions of Guarnieri and Singer, the ADA defendants, were performed in their function as advocates for the State in the judicial phase of the criminal process against King-Knight. The conduct on which King-Knight appears to predicate his claims against the ADA defendants can be summarized as their (1) failing to disclose to the defense in violation of Brady v. Maryland, 373 U.S. 83 (1963) that OCME's

protocols had changed so as to preclude the comparison to King-Knight's DNA profile and the generation of a CPI statistic; (2) "offer[ing] misleading forensic evidence created by OCME" at King-Knight's second trial; (3) maliciously prosecuting him; (4) and "work[ing] closely with Ho, Dr. Lien, Dr. O'Connor, and OCME in testing and comparing the DNA mixtures." (See, e.g., ECF 41 ¶¶ 2, 155, 170, 183, 185.) The first three acts are clearly protected by absolute immunity. Assuming that the alleged change in OCME's protocols constituted Brady material, a prosecutor's failure to disclose exculpatory evidence is entitled to absolute immunity because "the disclosure of evidence to opposing counsel is an advocacy function." Warney, 587 F.3d at 125. The same outcome holds with respect to the ADA defendants' decisions concerning what evidence to introduce at King-Knight's second trial. See Imbler, 424 U.S. at 431 (holding that prosecutors are absolutely immune "in presenting the State's case"); see also Collins v. City of New York, 923 F. Supp. 2d 462, 472 (E.D.N.Y. 2013) (noting that absolute immunity attaches when a prosecutor submits false evidence or suborns perjury). Regarding the ADA defendants' alleged malicious prosecution of King-Knight, "it has long been settled that prosecutors are entitled to immunity from § 1983 liability for initiating a prosecution." Hill v. City of New York, 45 F.3d 653, 661 (2d Cir. 1995).

Turning to the fourth act, King-Knight's allegation that "Guarnieri and Singer worked closely with Ho, Dr. Lien, Dr. O'Connor, and OCME in testing and comparing the DNA mixtures" is conclusory and does not lead to a plausible inference that Guarnieri and Singer acted outside their function as advocates. See Bermudez v. City of New York, 11-cv-750 (LAP), 2013 WL 593791, at *1, *6 (S.D.N.Y. Feb. 14, 2013) (finding allegation that prosecutor "conferred with the other named defendants and participated in the tainted line-up" conducted after the plaintiff's arrest to be conclusory and insufficient to "give rise to a plausible inference

that [the prosecutor] was acting outside his role as an advocate for the State"). King-Knight fails

to plausibly allege how Guarnieri and Singer participated in OCME's forensic analysis of the

DNA evidence. This "bald assertion" therefore "stops short of the line between possibility and

plausibility of entitlement to relief." Id. at *6 (quoting Iqbal, 556 U.S. at 678) (internal quotation

marks omitted).

       In any event, even if assistant district attorneys Guarnieri and Singer did work

with the OCME defendants and OCME to test and compare the DNA evidence, they would still

be entitled to absolute immunity for their conduct. This alleged act was taken while there was

"pending or in preparation a court proceeding in which the prosecutor acts as an advocate."

Warney, 587 F.3d at 123. Although OCME issued a report as to its initial examination of the

DNA recovered from the firearm in November 2008—before King-Knight was indicted by a

grand jury in May 2009—the Amended Complaint does not allege that this report, standing

alone, implicated King-Knight as the shooter, or that it was used in any proceedings against him

prior to his second trial that began in October 2011. (ECF 41 ¶¶ 128, 143, 170.) On the other

hand, the comparison to King-Knight's DNA profile in November 2010 and the generation of the

CPI statistic in December 2010 did implicate him, and this DNA evidence was subsequently

used against King-Knight in his second trial. (Id. ¶¶ 153, 154, 170.) If Guarnieri and Singer

participated in OCME's forensic analysis as the Amended Complaint alleges, it is only their later

conduct in 2010 that could provide a basis for King-Knight's claims against them. By that point,

however, King-Knight had already been indicted. (Id. ¶ 128.) His first trial, in which Guarnieri

and Singer served as prosecutors, would soon begin in May 2011. (Id. ¶¶ 132-33.) Guarnieri's

and Singer's alleged conduct was therefore "in the judicial phase of the case, i.e., after the

indictment was returned and in the pretrial stage." Deskovic v. City of Peekskill, 07-cv-8150

(KMK), 07-cv-9488 (KMK), 2009 WL 2475001, at *13 (S.D.N.Y. Aug. 13, 2009).  It was not

"undertaken in the phase of law enforcement that involves the gathering and piecing together of

evidence for indications of criminal activities and determination of the perpetrators."  Giraldo,

694 F.3d at 166.  Moreover, in allegedly helping to generate the DNA evidence, Guarnieri and

Singer were acting as advocates seeking to strengthen their case against King-Knight.  They

were not conducting a post-indictment investigation to identify a different perpetrator or bring

other charges against King-Knight.  As the Amended Complaint underscores, the DNA evidence

was "important to the prosecution's case as powerful scientific evidence corroborating"

Williams's challenged testimony identifying King-Knight as the shooter.  (ECF 41 ¶ 154.)  It is

precisely such alleged pretrial conduct on the part of Guarnieri and Singer that is protected by

absolute immunity.  See Jones v. City of New York, 988 F. Supp. 2d 305, 312 (E.D.N.Y. 2013)

(concluding that prosecutors' decision "whether to test for potentially inculpatory (or

exculpatory) DNA information" made in preparation for trial was entitled to absolute immunity);

Collins, 923 F. Supp. 2d at 472 (finding that prosecutor's pre-trial coercion of witnesses into

giving false testimony and presentation of that testimony at trial were actions "taken to ensure

his success at trial" that were entitled to absolute immunity); Deskovic, 2009 WL 2475001, at

*14 (concluding that prosecutor's discussion with medical examiner for the purpose of

"creat[ing] evidence for use at trial" in response to exculpatory evidence was protected by

absolute immunity).  Viewed in the context of King-Knight's indictment and the pretrial stage

that followed, a "reasonable prosecutor" would consider Guarnieri's and Singer's alleged

conduct to strengthen their case against King-Knight as "reasonably within the functions of a

prosecutor."  Giraldo, 694 F.3d at 166.

Because the ADA defendants are entitled to absolute immunity from King-Knight's claims brought under section 1983, the Court also concludes that they are entitled to the same immunity from all of King-Knight's state-law claims. See Collins, 923 F. Supp. 2d at 479 ("Prosecutors' immunity under state law is identical to their immunity under § 1983: 'District Attorneys are immune from civil liability for activities 'intimately associated with the judicial phase of the criminal process,' meaning 'initiating a prosecution and in presenting the State's case.'") (quoting Johnson v. Kings County District Attorney's Office, 308 A.D.2d 278, 285 (2nd Dept. 2003)). To the extent that King-Knight brings his claims against the ADA defendants in their official capacity, the Court further concludes that they are entitled to Eleventh Amendment sovereign immunity. See Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.").

B. The Amended Complaint Fails to Allege a Constitutional Violation by the OCME Defendants

"To state a claim under § 1983, a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law; and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." K.A. v. City of New York, 413 F. Supp. 3d 282, 294 (S.D.N.Y. 2019) (quoting Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999)). A complaint must therefore "contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983." Id. (quoting Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 887 (2d Cir. 1987)).

The Amended Complaint fails to adequately allege that the OCME defendants engaged in conduct that deprived King-Knight of his constitutional rights.  King-Knight principally bases his claims against the OCME defendants on the arguments that his appellate counsel advanced in moving to vacate his conviction.  (See ECF 41 ¶¶ 169-70.)  That motion contended that King-Knight's trial counsel rendered ineffective assistance by not seeking to preclude the admission of the DNA evidence that was offered at King-Knight's second trial.  (See ECF 51-7 at 3-6.)  In the Amended Complaint, King-Knight summarizes the "bases for the motion to vacate," broadly stating that the use of CPI "was not generally accepted as reliable in the forensic science community," that OCME "never validated LCN for use in the underlying criminal matter," which is a "mandatory requirement" in New York State, and that, pursuant to changed "OCME protocols" in place in 2010, OCME could not make a comparison to King-Knight's DNA profile or generate a CPI statistic.  (ECF 41 ¶ 170.)  But he does not identify with sufficient specificity the forensic standards, New York State requirement, or OCME protocols that he claims the OCME defendants violated.  Regardless, section 1983 "provides a remedy for the violation of rights protected by the Constitution or federal law."  Bah v. City of New York, 13-cv-6690 (PKC), 2017 WL 435823, at *6 (S.D.N.Y. Jan. 31, 2017).  At most, the Amended Complaint alleges that the OCME defendants failed to comply with best practices in the forensic science community, a state mandate, and agency policies when they generated the DNA evidence that was used against King-Knight.  Such violations do not, in and of themselves, amount to violations of rights protected by the Constitution or federal law that are actionable under section 1983.[5]  See id. (finding that section 1983 does not provide a remedy for violations

---

[5] New York follows the Frye standard requiring that a methodology be generally accepted in the relevant scientific community rather than the arguably less stringent standard under Daubert.  Compare Frye v. U.S., 293 F. 1013, 1014 (D.C. Cir. 1923), with Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 588-89 (1993).  The fact that

of the police Patrol Guide or departmental policy); Thomas v. Mason, 17-cv-626 (DJS), 2023

WL 2709730, at *16 (N.D.N.Y. Mar. 30, 2023) (noting that a failure to follow best practices in

conducting an autopsy is not actionable as a section 1983 claim), aff'd, 2024 WL 5199296 (2d

Cir. Dec. 23, 2024); Mills v. Fischer, 09-cv-966A, 2011 WL 91028, at *2 (W.D.N.Y. Jan. 11,

2011) (observing that "a violation of a state law or regulation, in and of itself, does not give rise

to liability under [section] 1983"), aff'd, 497 F. App'x 114 (2d Cir. 2012).

       King-Knight's additional allegations that OCME "lied that it did validate LCN for

use in the underlying criminal matter," that "defendants failed to disclose that OCME protocols

had changed," and that "defendants offered misleading forensic evidence created by OCME" fail

to give rise to liability under section 1983 on the part of the OCME defendants.  (ECF 41 ¶ 170.)

First, insofar as the Amended Complaint alleges that the OCME defendants testified falsely as to

OCME's validation of LCN, they are protected by absolute immunity as testifying witnesses.

See Jones v. King, 10-cv-0897 (PKC), 2011 WL 4484360, at *6 (S.D.N.Y. Sept. 28, 2011) ("It is

well established that testifying witnesses, including police officers, are entitled to absolute

immunity from liability under § 1983 based on their testimony.") (quoting Rolon v. Henneman,

443 F. Supp. 2d 532, 536 (S.D.N.Y. 2006)).  Second, the OCME defendants' disclosure

obligations with respect to exculpatory evidence do not extend beyond disclosing that evidence

to prosecutors.  See Walker v. City of New York, 974 F.2d 293, 299 (2d Cir. 1992) (holding that

"the police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the

prosecutors"); see also Horn v. Stephenson, 11 F.4th 163, 172 (2d Cir. 2021) (concluding, "based

on *Walker*, that *Brady* applies to forensic examiners in state crime laboratories").  Thus, to the

extent the Amended Complaint alleges that the OCME defendants failed to disclose to King-

---

trial evidence did not meet New York's more exacting standard of admissibility does not amount to a violation of
the U.S. Constitution.

Knight's defense counsel that OCME protocols had changed, they cannot be held liable under section 1983 for that conduct.  The Amended Complaint does not allege that the OCME defendants failed to disclose that change to the prosecutors.  Third, decisions concerning what evidence to introduce at King-Knight's second trial were ones for the ADA defendants to make and for which they are entitled to absolute immunity.

King-Knight's section 1983 claims against the OCME defendants will be dismissed.  Having resolved these claims on the merits, the Court need not reach the issue of whether the OCME defendants are entitled to absolute or qualified immunity for their work in testing and comparing the DNA evidence.  Because King-Knight has named the City of New York as a defendant, the Court also dismisses the official-capacity claims against the OCME defendants as duplicative of King-Knight's claims against the City of New York.  See In re New York City Policing During Summer 2020 Demonstrations, 548 F. Supp. 3d 383, 409 (S.D.N.Y. 2021) ("[C]ourts in the Second Circuit routinely dismiss official capacity claims against municipal officials as duplicative of the claims against the municipality.").

C. The Amended Complaint Fails to State a Section 1983 Claim Against the NYPD Defendants

    1. Malicious Prosecution

To state a claim for malicious prosecution under section 1983, "a plaintiff is required to demonstrate: (i) the commencement or continuation of a criminal proceeding against [him]; (ii) the termination of the proceeding in [his] favor; (iii) that there was no probable cause for the proceeding; and (iv) that the proceeding was instituted with malice."  Mitchell v. City of New York, 841 F.3d 72, 79 (2d Cir. 2016) (quoting Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003)) (internal quotation marks omitted).  The existence of probable cause therefore bars a claim for malicious prosecution.  Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003).

Indictment by a grand jury "creates a presumption of probable cause." Rothstein v. Carriere, 373 F.3d 275, 282-83 (2d Cir. 2004) (quoting Colon v. City of New York, 60 N.Y.2d 78, 82 (1983)). "Thus, in order for a plaintiff to succeed in a malicious prosecution claim after having been indicted, 'he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" Id. at 283 (quoting Colon, 60 N.Y.2d at 83). More specifically, "[t]he burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially.'" Id. at 284 (quoting Colon, 60 N.Y.2d at 82) (brackets omitted).

King-Knight's indictment by a grand jury on May 15, 2009 creates a presumption that probable cause for his prosecution existed. (ECF 41 ¶ 128.) That presumption is only bolstered by the state court's subsequent Decision and Order, of which the Court takes judicial notice, finding that "[t]he evidence before the grand jury was sufficient to support each and every count in the indictment." (ECF 51-6 at 2.) King-Knight asserts that the grand jury relied on the NYPD defendants' "falsified records and coerced witness statements including the testimony of Mses. Williams and Shepherd -- who had become well rehearsed liars and who were promoted by NYPD defendants" in returning an indictment against him. (ECF 41 ¶ 128.) Outside of the single-photo identification that was conducted with Williams on September 9, 2008, the Amended Complaint's allegations against the NYPD defendants relevant to establishing misconduct in the grand jury are conclusory. In addition, King-Knight fails to establish a connection between the single-photo identification procedure and the procurement of the indictment. The Court concludes that King-Knight fails to rebut the presumption of probable cause resulting from his indictment.

The Amended Complaint does not plausibly allege that the NYPD defendants falsified any records.  King-Knight claims that Geary and Bencosme "spoon-fe[d] witnesses false information during pre-interviews for repetition in official statements" and "falsified some of the witnesses' statements."  (Id. ¶¶ 103, 105.)  These accusations have no factual content concerning what information was spoon-fed or falsified, who the witnesses were, or what records were generated.  King-Knight also appears to suggest that Geary was not fully forthcoming in "purportedly documenting his . . . August 30, 2008 canvass of the area around the house and the photos of male [B]lacks named Marcus, which he allegedly obtained from the photo manager." (Id. ¶ 101.)  But King-Knight does not identify with sufficient specificity the information that Geary provided in these records or what of it was false.  The threadbare allegation that the "unknown [B]lack female" who gave Geary a tip about the shooter while he was still in the area around the house "was manufactured and/or created by Geary and did not exist at any time" does not alone give rise to a plausible inference that he in turn falsified documentation pertaining to his canvass.  (Id. ¶¶ 91, 98.)

The Amended Complaint also fails to plausibly allege that the NYPD defendants engaged in conduct that was designed to coerce statements from Shepherd, Williams, or any other witnesses.  King-Knight provides little more than the conclusory claim that Geary and Bencosme "coerce[d] witnesses to falsely implicate [him]."  (Id. ¶ 108.)  He does not identify these witnesses or specify through what means they were coerced.  Regarding Shepherd, King-Knight only specifies that Geary called her on February 14, 2009 and that she informed him that "she does not have any additional information on the perp."  (Id. ¶¶ 109-10.)  As to Williams, King-Knight alleges that Geary and Bencosme "arranged" to meet with her on September 9, 2008 and that they told her in advance that "they had a photo of the shooter named Marcus and

that they were bringing the photo of the shooter so she could look at it and place her initials on

the paper." (Id. ¶¶ 106-07.)  According to King-Knight, Geary "asked" her to place her initials

on King-Knight's photo while she was seated in the back of Geary's and Bencosme's police car.

(Id. ¶¶ 112-13.)  Williams subsequently identified King-Knight as the shooter.  (Id. ¶ 118.)

Although, as discussed below, King-Knight plausibly alleges that this single-photo identification

conducted with Williams was unduly suggestive, King-Knight's allegations are not sufficient to

support his claim that the NYPD defendants coerced statements from Shepherd, Williams, or any

other witnesses.  See Jefferson v. Kelly, 06-cv-6616 (NGG) (LB), 2008 WL 1840767, at *5

(E.D.N.Y. Apr. 22, 2008) (concluding that the plaintiff did not sufficiently show that his

statement was coerced because he did not "allege any specific actions on the part of the

detectives that appear designed to overcome his will and produce an involuntary incriminating

statement").

    The Amended Complaint does plausibly allege that the single-photo identification

conducted with Williams on September 9, 2008 was impermissibly suggestive.  See U.S. v.

Stanley, 09-cr-0141 (NGG), 2009 WL 5066864, at *4-5 (E.D.N.Y. Dec. 22, 2009) (adopting

report and recommendation) (noting that "[s]ingle-photo identifications are generally disfavored

as unduly suggestive" and describing the "typical single-photo identification" as one "in which

the police have a suspect in mind and show a witness a photograph of that person in the hopes of

confirming their theory").  Even so, that fact on its own is not sufficient to rebut the presumption

of probable cause resulting from King-Knight's grand jury indictment.  Notably, the Amended

Complaint alleges that Geary documented the September 9 meeting with Williams in his "DD-5

Follow-Up No. 22."  (ECF 41 ¶ 118.)  According to Geary's report, after he gave Williams the

photo of King-Knight and she identified him as the shooter, Williams informed him and

Bencosme that she "was told that the perp's name is Marcus" and that she "has known of him and seen him in the neighborhood for years." (Id.) Geary's report therefore reflected the fact that Williams had a basis independent from the suggestive identification procedure for knowing King-Knight.

A witness's independent basis for knowing or identifying a suspect is not necessarily tainted by a suggestive showing. In Bermudez v. City of New York, 790 F.3d 368, 371, 377 (2d Cir. 2015), for example, two witnesses implicated the plaintiff in a shooting through allegedly suggestive photo identification and array procedures conducted by the investigating officers. The prosecutor subsequently conducted interviews with these two witnesses during which one said they saw the plaintiff reach for a gun at the scene of the shooting and the other said they saw him shoot the victim. Id. at 372. The two witnesses testified consistent with their interviews before the grand jury that indicted the plaintiff. Id. at 377. Notwithstanding the allegedly suggestive procedures, the Second Circuit concluded that the prosecutor's interviews of the two witnesses provided probable cause to prosecute the plaintiff. Id. Indeed, in this case, the state court held a Rodriguez hearing before King-Knight's first trial wherein it determined that Williams would be allowed to make an in-court identification of King-Knight despite the suggestive identification procedure. (See ECF 41 ¶¶ 129-31.) In New York, a Rodriguez hearing is held in place of a hearing pursuant to U.S. v. Wade, 388 U.S. 218 (1967) "when the prosecution alleges that, by virtue of a prior relationship between a witness and the defendant, the witness is 'impervious to police suggestion,' and her identification is therefore untainted by an otherwise suggestive pretrial identification procedure." Kelly v. Lee, 11-cv-3903 (CBA), 2014 WL 4699952, at *1 n.1 (E.D.N.Y. Sept. 22, 2014) (quoting Stallings v. Woods, 04-cv-4714 (RLM), 2006 WL 842380, at *16 n.17 (E.D.N.Y. Mar. 27, 2006)).

Consistent with the state court's ruling, Williams, "who claimed to know the plaintiff from the neighborhood," made an in-court identification of King-Knight during his second trial. (ECF 41 ¶¶ 145-46.)

In light of Geary's report documenting that Williams had an independent basis for knowing King-Knight, i.e., that she had "known of him and seen him in the neighborhood for years," King-Knight fails to establish a connection between the suggestive showing and any misconduct in the grand jury. (Id. ¶ 118.) The Amended Complaint does not allege that Geary's report was withheld from the prosecutors prior to the grand jury proceeding. Therefore, like the inculpatory information that the prosecutor gleaned from his interviews of the two grand jury witnesses in Bermudez, the prosecution here had a basis for eliciting testimony from Williams at the grand jury identifying King-Knight as the shooter that was independent from, and not tainted by, the suggestive identification procedure. 790 F.3d at 372, 377.

The Amended Complaint fails to show how the prosecutors' reliance on that independent basis, or Williams's testimony in general, constituted misconduct in procuring the grand jury indictment. There is no allegation that the photo of King-Knight that Williams initialed was introduced as evidence during the grand jury. Nor is there any allegation that the prosecution elicited testimony concerning the photo or the suggestive showing. King-Knight claims that Geary and "defendant officers" "lied" to the prosecutors that they conducted a "proper" showing with Williams and that the NYPD defendants "promoted" Williams as a grand jury witness despite knowing that she had "already lied about the plaintiff's involvement in the shooting." (ECF 41 ¶¶ 129, 178, 190.) But these allegations do not change the fact that the prosecutors also had Geary's report documenting Williams's independent basis for knowing King-Knight available to them in deciding whether to call her as a grand jury witness. As

discussed more fully below, that decision was ultimately left to the independent judgment of the prosecutors, rather than any acts or statements by the NYPD defendants.

In addition to King-Knight's failure to make a connection between the NYPD defendants' alleged misconduct and the indictment, the Amended Complaint says almost nothing about the grand jury proceeding itself. The Amended Complaint simply alleges that "[r]elying on the falsified records, coerced witness statements, and the testimony of Messrs. Williams and Shepherd the grand jury returned a true bill of indictment against the plaintiff." (Id. ¶ 180.) This conclusory allegation is not sufficient to establish "what occurred in the grand jury," let alone "that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially.'" Rothstein, 373 F.3d at 284 (quoting Colon, 60 N.Y.2d at 82) (brackets omitted). While it is reasonable to infer that Williams identified King-Knight as the shooter in her testimony, the Amended Complaint does not specify the content of Williams's and Shepherd's testimony or what records and witness statements were introduced. In Rothstein, the Second Circuit concluded that the plaintiff failed to rebut the presumption of probable cause where "the content of [the witness's] grand jury testimony is unknown, as is the content of the rest of the government's presentation." Id. The paucity of information here warrants the same outcome. This shortcoming is particularly noteworthy given that in the same Decision and Order in which the state court affirmed the sufficiency of the indictment it granted King-Knight's motion to inspect the grand jury minutes. (ECF 51-6 at 2.)

Because King-Knight fails to rebut the presumption of probable cause resulting from his grand jury indictment, his claim of malicious prosecution against the NYPD defendants under section 1983 will be dismissed.

2. Denial of Fair Trial Based on Fabrication of Evidence

King-Knight also brings a claim for the violation of his due process right to a fair trial based on the alleged fabrication of evidence by the NYPD defendants.  To state a section 1983 fair trial claim, "a plaintiff must establish that (1) the officer created false information, (2) the officer forwarded the false information to prosecutors, (3) the false information was likely to influence a jury's decision, and (4) the plaintiff suffered a deprivation of life, liberty, or property as a result of the officer's actions."  Kee v. City of New York, 12 F.4th 150, 168 (2d Cir. 2021). "A § 1983 action, like its state tort analogs, employs the principle of proximate causation." Townes v. City of New York, 176 F.3d 138, 146 (2d Cir. 1999).  In the context of a fair trial claim, a court must therefore determine whether the deprivation of liberty is the "legally cognizable result of the initial misconduct," or if instead the "acts of subsequent participants in the legal system are superseding causes that avoid liability of an initial actor."  Zahrey v. Coffey, 221 F.3d 432, 351 (2d Cir. 2000).  The existence of probable cause "is not a defense to a fair trial claim based on the fabrication of evidence."  Frost v. New York City Police Department, 980 F.3d 231, 248 (2d Cir. 2020).  As such, "fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims."  Kee, 12 F.4th at 169 (quoting Garnett v. Undercover Officer C0039, 838 F.3d 265, 277-78 (2d Cir. 2016)).

Outside of the conclusory allegations in the Amended Complaint, King-Knight's fair trial claim against the NYPD defendants primarily rests on the well-pleaded fact that Geary and Bencosme conducted a suggestive identification procedure with Williams.  A suggestive showing does not on its own give rise to a constitutional violation.  Wray v. City of New York, 490 F.3d 189, 193 (2d Cir. 2007).  Rather, when a witness makes an identification following an impermissibly suggestive procedure, "the due process focus is principally on the fairness of the

trial." Id. (quoting Wray v. Johnson, 202 F.3d 515, 524 (2d Cir. 2000)).  The acts of other participants in the legal system that are taken subsequent to the suggestive showing may in turn break the chain of causation flowing from that misconduct.  In Wray, for instance, the plaintiff brought a section 1983 action against an officer who had conducted a suggestive showup identification.  Id. at 192-93.  The Second Circuit found that the officer was not liable for the plaintiff's incarceration and conviction because superseding acts by the prosecutor in offering testimony regarding the showing at trial and by the trial judge in permitting that testimony broke the chain of causation between the officer's misconduct and the constitutional harm.  Id. at 193.  In reaching this conclusion, the Second Circuit noted the absence of any allegation that the officer "misled or pressured the prosecution or trial judge."  Id.  Similarly, in Townes, the plaintiff brought section 1983 claims against officers who had performed an unconstitutional seizure and search of his person and stop of the taxicab he was riding in.  176 F.3d at 145.  The Second Circuit determined that the officers' misconduct was not the proximate cause of the plaintiff's conviction and incarceration because the trial court's refusal to suppress the evidence of his criminal activity that the officers had obtained was an intervening and superseding act.  Id. at 146.

Going to the issue of proximate causation, King-Knight alleges that Geary "consistently lied to the prosecutors that he conducted a proper single photo identification procedure" with Williams and that "defendant officers falsely stated to the prosecutors that plaintiff was identified from a properly conducted identification procedure."[6]  (ECF 41 ¶¶ 129,

---

[6] King-Knight also alleges that "defendant officers falsely stated to the prosecutors . . . that a mixture of DNA on the slide/slide release of the gun led to an inculpatory statistic as to the plaintiff."  (ECF 41 ¶ 190.)  Nowhere in the Amended Complaint does King-Knight allege that the NYPD defendants played any role in the generation of the CPI statistic or that they were even aware of its existence.  The Court disregards this allegation because it is not plausibly alleged against the NYPD defendants.

190.)  Based on the Court's reading of the allegations in the Amended Complaint, this claimed

lie purportedly distorted the prosecutors' decisions to seek the grand jury indictment of King-

Knight and his later conviction.  (See id. ¶¶ 189-91.)  The resulting deprivations of King-

Knight's liberty were the periods he was incarcerated following (1) his indictment on May 15,

2009 and (2) his conviction on December 1, 2011.  (Id. ¶¶ 128, 161.)

        The Court concludes that the Amended Complaint does not plausibly allege that

the NYPD defendants misled the prosecutors in connection with their decision to seek the grand

jury indictment.  The Amended Complaint alleges that the NYPD defendants lied to the

prosecutors that the single-photo identification was "proper" or "properly conducted."  (Id. ¶¶

129, 190.)  The substance of this claimed lie reduces to nothing more than a conclusion on the

part of the NYPD defendants, which they allegedly conveyed to the prosecutors, that they

adhered to governing protocols.  Such a conclusion, arrived at by law enforcement officers

ostensibly assessing their own conduct, would have demanded additional investigation into the

nature of the identification procedure by the prosecutors weighing whether to charge King-

Knight.  Cf. Bermudez, 790 F.3d at 375 (noting that if a prosecutor "was simply not informed of

the alleged problems with the evidence" he could not be a superseding cause of the constitutional

deprivation).  Even if this conduct could rightly be characterized as a lie, it does not give rise to a

plausible inference that it impacted the prosecutors' "exercise of independent judgment" in

seeking the indictment.  Townes, 176 F.3d at 147.  As the Second Circuit has explained, a

"prosecutor's decision to pursue charges rather than to dismiss [a] complaint without further

action[] may depend on the prosecutor's . . . assessment[] of the strength of the case, which in

turn may be critically influenced by fabricated evidence."  Frost, 980 F.3d at 248 (quoting

Garnett, 838 F.3d at 277.)  Here, the prosecutors had access to Geary's report documenting

Williams's independent basis for knowing King-Knight.  (ECF 41 ¶ 118.)  As previously discussed, the state court later concluded that that independent basis was not tainted by the suggestive showing.  Thus, regardless of what the NYPD defendants told the prosecutors about the identification procedure, they had powerful evidence of King-Knight's guilt at hand in determining that they had a strong enough case against him to proceed with the indictment.  The Amended Complaint does not allege that during the grand jury proceeding the prosecution relied on the photo of King-Knight that Williams initialed or testimony concerning the showing in order to obtain an indictment.  These facts do not lead the Court to infer that the prosecutors were "critically influenced" by the NYPD defendants' alleged lies.  Frost, 980 F.3d at 248 (quoting Garnett, 838 F.3d at 277.)  Accordingly, the Court concludes that the prosecutors' superseding act broke the chain of causation between the NYPD defendants' claimed misconduct and the deprivation of King-Knight's liberty resulting from his indictment.

The Court further concludes that the NYPD defendants' alleged lies regarding the suggestive identification procedure did not proximately cause King-Knight's deprivation of liberty following his conviction.  At the Rodriguez hearing that was held before King-Knight's first trial, the court determined that the single-photo identification "was totally improper and unconstitutionally suggestive."  (ECF 41 ¶ 131.)  It nonetheless allowed for Williams to make an in-court identification of King-Knight at trial because she had an independent basis for the identification.  (See id.)  By the time of the Rodriguez hearing, then, both the prosecution and trial court were well aware of any problems with the single-photo identification.  Going into trial, neither the prosecutors nor the trial court could have been misled by the NYPD defendants' conduct.  The independent decisions of the prosecutors to continue prosecution and of the hearing judge to permit the in-court identification were therefore superseding acts that broke the

chain of causation between the NYPD defendants' alleged misconduct and any claimed denial of King-Knight's right to a fair trial.  See Wray, 490 F.3d at 193 (finding no proximate cause where the constitutional violation was caused by the intervening acts of the prosecutor and trial judge and there was no allegation that these actors were misled).

As a result, King-Knight's section 1983 claim for the violation of his due process right to a fair trial based on the alleged fabrication of evidence by the NYPD defendants will be dismissed.

### 3. Unreasonably Prolonged Detention

King-Knight brings a claim for "unreasonable detention" premised on the allegation that the NYPD defendants denied him his "due process right to be free from continued detention after it was known or should have been known that plaintiffs were entitled to release." (ECF 41 ¶ 196.)  In his memorandum of law in opposition to defendants' motion to dismiss, King-Knight cites to the Second Circuit's decision in Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir. 2007) as forming the basis of this claim.  (ECF 63 at 30.)  In that case, the Second Circuit recognized a claim, rooted in the Fourth Amendment's protection against unreasonable seizures, for "unreasonably prolonged detention."  Russo, 479 F.3d at 205, 209.  Therefore, the Court will treat King-Knight's claim as one for unreasonably prolonged detention.

To state such a claim, a plaintiff must establish "(1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct 'shocks the conscience.'"  Id. at 205 (citation omitted).  In Russo, the Second Circuit considered three factors in determining whether the plaintiff's detention was unreasonably prolonged: "(1) the length of time of [the plaintiff's] wrongful incarceration, (2)

the ease with which the evidence exculpating [him]—which was in the officers' possession—
could have been checked, and (3) the alleged intentionality of [the officers'] behavior." Id. at
209. Courts in this Circuit have narrowly interpreted the second factor to require the plaintiff to
show that "the defendant-officer, by expending reasonable cost and effort, could have
conclusively established the plaintiff's innocence." Thompson v. City of New York, 603 F.
Supp. 2d 650, 656 (S.D.N.Y. 2009); see also Creighton v. City of New York, 12-cv-7454 (PGG),
2017 WL 636415, at *45 (S.D.N.Y. Feb. 14, 2017) ("In order to satisfy the Russo standard for
excessive pre-trial detention, such exculpatory evidence must have conclusively or affirmatively
established [Plaintiff's] innocence.") (citation omitted). This construction is consistent with the
facts of Russo itself, where the "evidence of [the plaintiff's] innocence" was a videotape in the
officers' possession showing that the perpetrator of a robbery had arms that were free of tattoos,
while the plaintiff "had prominent tattoos on his forearms." 479 F.3d at 199-200, 210.

        King-Knight's Amended Complaint does not identify the exculpatory evidence on
which his claim against the NYPD defendants is based. The Amended Complaint's allegations
against the NYPD defendants are largely conclusory, but King-Knight does plausibly allege that
they conducted a suggestive single-photo identification with Williams. To go along with this,
King-Knight has alleged that the NYPD defendants lied that they conducted a "proper" showing
of the photo to her. (ECF 41 ¶¶ 129, 190.) To the extent that King-Knight's claim is based on
the suggestive identification procedure and alleged lies regarding its propriety, the Court
concludes that he has failed to state a claim against the NYPD defendants. Simply put, these
allegations do not give rise to an inference that Geary or Bencosme withheld evidence that could
have conclusively established that King-Knight was not the shooter. See Delamota v. City of
New York, 14-cv-5888 (NG), 2016 WL 3023267, at *6 (E.D.N.Y. May 24, 2016) (dismissing

unreasonably prolonged detention claim where the plaintiff alleged that the officer withheld information from prosecutors and the grand jury regarding the "suggestive nature" of a photo array because that evidence did not prove that he was not the perpetrator), aff'd, 683 F. App'x 65 (2d Cir. 2017). Other evidence, namely Williams's identification of King-Knight based on her having "known of him and seen him in the neighborhood for years," pointed in exactly the opposite direction. (ECF 41 ¶ 118.)

Accordingly, this claim will be dismissed.

### 4. Failure to Intervene

King-Knight's remaining section 1983 claim against the NYPD defendants is for failure to intervene. "It is well established that absent an underlying constitutional violation, there can be no failure to intervene violation." Fincher v. City of New York, 19-cv-6206 (MKV), 2021 WL 4461161, at *6 (S.D.N.Y. Sept. 29, 2021) (citing Wieder v. City of New York, 569 F. App'x 28, 30 (2d Cir. 2014)). Because King-Knight's claims for malicious prosecution, denial of fair trial, and unreasonably prolonged detention against the NYPD defendants are dismissed, the claim for failure to intervene necessarily fails. The motion to dismiss this claim will be granted.

Having resolved King-Knight's claims against the NYPD defendants on the merits, the Court need not address the issue of whether they are entitled to qualified immunity. As with the OCME defendants, the Court also dismisses the official-capacity claims against the NYPD defendants as duplicative of King-Knight's claims against the City of New York. See In re New York City Policing During Summer 2020 Demonstrations, 548 F. Supp at 409.

D. King-Knight's Monell Claim Against the City of New York Fails

           King-Knight's claim for municipal liability under section 1983 is brought against the City of New York pursuant to Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978). His claim is wholly premised on the NYPD's alleged policies or customs and the NYPD's purported failure to train its police officers. (See ECF 41 ¶¶ 206, 210, 211.) As discussed above, King-Knight's claims for constitutional violations on the part of the NYPD defendants are dismissed. "It is well-settled that a Monell claim cannot succeed without an underlying constitutional violation, and here there is no constitutional violation." Johnson v. City of New York, 21-cv-5268 (PKC), 2022 WL 4133284, at *6 (S.D.N.Y. Sept. 12, 2022) (quoting Mastromonaco v. City of Westchester, 779 F. App'x 49, 51 (2d Cir. 2019)). Accordingly, King-Knight's municipal liability claim will be dismissed.

E. King-Knight's State-Law Claims Are Dismissed

           The Court declines to exercise supplemental jurisdiction over King-Knight's remaining state-law claims. A district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); see also Kolari v. New York-Presbyterian Hospital, 455 F.3d 118, 122 (2d Cir. 2006). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity,' . . . in deciding whether to exercise jurisdiction." Kolari, 455 F.3d at 122 (quoting Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 (1988)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Id. (quoting Cohill, 484 U.S. at 350 n.7).

All of King-Knight's federal claims will be dismissed, and none of the <u>Cohill</u> factors supports the exercise of supplemental jurisdiction over his remaining state-law claims. The Court therefore declines to exercise supplemental jurisdiction.

## F. <u>Leave to Amend is Denied</u>

In his memorandum of law, King-Knight requests that he be permitted to file and serve a proposed second amended complaint. (ECF 63 at 33.) He states that he "merely seek[s] to drop certain claims, include his false arrest claim which was omitted due to oversight, correct certain typographical errors, and allege specific facts and/or amplify facts pertaining to his Monell liability claim." (<u>Id.</u>) He adds that he "did not include any new causes of action." (<u>Id.</u>) King-Knight has submitted the proposed second amended complaint to the Court. (ECF 61-1 at 2-33.)

"Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend. A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." <u>Northern Jersey Plastic Surgery Center, LLC v. 1199SEUI National Benefit Fund</u>, 22-cv-6087 (PKC), 2023 WL 5956142, at *21 (S.D.N.Y. Sept. 13, 2023) (quoting <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 200 (2d Cir. 2007)). "Leave to amend is futile if the plaintiff's 'proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." <u>Id.</u> (quoting <u>Panther Partners Inc. v. Ikanos Communications, Inc.</u>, 681 F.3d 114, 119 (2d Cir. 2012)).

Having reviewed King-Knight's proposed second amended complaint, the Court concludes that leave to amend is futile. The Court would decline to exercise supplemental

jurisdiction over the additional state-law false arrest claim. King-Knight's additional allegations regarding the NYPD's alleged policies or customs and the NYPD's purported failure to train its police officers would not change the fact that he has failed to establish an underlying constitutional violation by the NYPD defendants. (See ECF 61-1 ¶¶ 212-34.) Therefore, the Court denies King-Knight's request.

The Court further notes that on January 18, 2024 it approved and adopted an agreement between the parties whereby defendants consented to King-Knight's filing of the Amended Complaint on the condition that he would seek no further amendments "except for amendments based on information that could not have been available to the plaintiff at the time the [A]mended [C]omplaint is filed." (ECF 40 at 1.) King-Knight has not shown that the information he seeks to add was unavailable to him at the time he filed the Amended Complaint. The Court's adherence to its prior ruling will avoid undue prejudice to defendants.

CONCLUSION

For the reasons explained above, defendants' motion to dismiss the Amended Complaint is GRANTED. The Clerk of Court is respectfully directed to terminate the motion pending at ECF 51 and enter judgment for defendants.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 28, 2025